Vickie L. Driver
Texas Bar No. 24026886
Christina W. Stephenson
Texas Bar No. 24049535
HUSCH BLACKWELL LLP
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
Phone: (214) 999-6100
Fax: (214) 999-6170
Email: vickie.driver@huschblackwell.com
Email: crissie.stephenson@huschblackwell.com

COUNSEL FOR THE DEBTORS

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **FOUNDATION HEALTHCARE, INC.,** | § | **CASE NO. 17-42571-rfn-11** |
| | § | **Lead Case** |
| **DEBTOR.** | § | |
| | § | **Complex Case** |
| ------------------------------------------------------ § | | **Jointly Administered** |
| | § | |
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **UNIVERSITY GENERAL HOSPITAL, LLC,** | § | **CASE NO. 17-42570-rfn-11** |
| | § | |
| **DEBTOR.** | § | **Complex Case** |
| | § | **Jointly Administered** |
| ------------------------------------------------------ § | | **Under Lead Case** |

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED
CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017**

> *The Disclosure Statement and the documents accompanying it contain a number of defined terms, which are denoted with capital letters. Please refer to Section 2.1 of the Plan for a complete listing and definitions of the capitalized terms used herein.*

The Disclosure Statement in Support of the Debtors' First Amended Chapter 11 Plan of Liquidation Dated as of August 8, 2017 (the "Disclosure Statement") describes the Debtors' First Amended Chapter 11 Plan of Liquidation Dated as of August 8, 2017 (the "Plan"), which has been Filed with the Disclosure Statement in the Debtors' chapter 11 cases currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"). A copy of the Plan is attached hereto as **Appendix "1"** and is incorporated herein by reference.

If you have a Claim against the Debtors, you should read the Disclosure Statement and the Plan carefully. The Debtors urge all holders of Claims in Impaired Classes receiving Ballots to accept the Plan.

The Disclosure Statement (and the appendices hereto), the Plan, the accompanying forms of Ballot, if any, and the related materials delivered together herewith are being furnished by the Debtors to holders of Impaired Claims pursuant to 11 U.S.C. § 1125, in connection with the solicitation by the Debtors of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

The Disclosure Statement is designed to provide adequate information to enable holders of Claims against the Debtors to make an informed judgment on the Plan. All Creditors are encouraged to read the Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The statements made in the Disclosure Statement are qualified in their entirety by reference to the Plan, the Appendices annexed hereto and other documents referenced as Filed with the Court before or concurrently with the filing of the Disclosure Statement. Furthermore, the projected financial information contained herein has not been the subject of an audit. Subsequent to the date hereof, there can be no assurance (i) that the information and representations contained herein will continue to be materially accurate, or (ii) that the Disclosure Statement contains all material information.

All holders of Impaired Claims should read and consider carefully the matters described in the Plan and Disclosure Statement as a whole, including Section V, entitled "RISK FACTORS," prior to voting on the Plan. In making a decision to accept or reject the Plan, each Creditor must rely on its own examination of the Debtors as described in the Disclosure Statement and the terms of the Plan, including the merits and risks involved. In addition, Confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that each of these conditions precedent will be satisfied or waived (as provided in the Plan) or that the Plan will be consummated. Even after the Effective Date, Distributions under the Plan may be subject to substantial delays for holders of Disputed Claims.

The Disclosure Statement has been conditionally approved by order of the Court as containing adequate information of a kind and in sufficient detail to enable holders of Claims to make an informed judgment with respect to voting to accept or reject the Plan. However, the Court's conditional approval of the Disclosure Statement does not constitute a recommendation or determination by the Court with respect to the merits of the Plan.

With the exception of historical information, some matters discussed herein, including the projections and valuation analysis described herein are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially from future results expressed or implied by such forward looking statements.

No party is authorized by the Debtors to give any information or make any representations with respect to the Plan other than that which is contained in the Disclosure Statement or the Plan. No representation or information concerning the Debtors, their future

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page ii**

AUS-6407724-1

operations or the value of their property has been authorized by the Debtors, other than as set forth herein. Any information or representation given to obtain your acceptance or rejection of the Plan that is different from or inconsistent with the information or representations contained herein and in the Plan should not be relied upon by any holders of Claims in voting on the Plan.

The Disclosure Statement has been prepared in accordance with § 1125 and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Interests in or securities of, the Debtors should evaluate the Disclosure Statement only in light of the purpose for which it was prepared.

The Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission or by any state securities commission or similar public, governmental or regulatory authority, and neither the Securities and Exchange Commission nor any such authority passed upon the accuracy or adequacy of the statements contained herein.

With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), the Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any Entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.

Each holder of a Claim or Interest should consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan or the transactions contemplated thereby.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the summaries thereof contained in the Disclosure Statement.

## INCORPORATION OF DOCUMENTS BY REFERENCE

The Disclosure Statement incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith. The following documents are incorporated by reference herein in their entirety:

1. UGH's *Schedules of Assets and Liabilities*, Filed on July 6, 2017, including all amendments and restatements thereto Filed through the date of the conditional approval of the Disclosure Statement (Docket No. 42) (the "UGH Schedules").

2. FHI's *Schedules of Assets and Liabilities*, Filed on July 6, 2017, including all amendments and restatements thereto Filed through the date of the conditional approval of the Disclosure Statement (Docket No. 36) (the "FHI Schedules," and collectively with the UGH Schedules, the "Schedules")).

3. UGH's *Statements of Financial Affairs*, filed on July 6, 2017, including all amendments and restatements thereto filed through the date of the conditional approval of the Disclosure Statement (Docket No. 43) (the "UGH SOFA").

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page iii**

AUS-6407724-1

4.  FHI's *Statements of Financial Affairs*, Filed on July 6, 2017, including all amendments and restatements thereto Filed through the date of the conditional approval of the Disclosure Statement (Docket No. 37) (the "<u>FHI SOFA</u>" and collectively with the UGH SOFA, the "<u>SOFAS</u>")).

5.  The Final DIP Order.

6.  The Plan, which has been Filed contemporaneously herewith.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in the Disclosure Statement, shall be deemed to be modified or superseded for purposes of the Disclosure Statement to the extent a statement contained herein modifies or supersedes such statement.

## AVAILABLE INFORMATION

Documents Filed in the Cases are available at <u>www.donlinrecano.com/FHI</u>.

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY. .......................................................................... 1
      A.    The Solicitation. ............................................................................................... 1
      B.    Recommendation. ............................................................................................. 2
      C.    Summary of the Plan. ...................................................................................... 2
      D.    Votes Required for Acceptance; Confirmation. ............................................. 5
      E.    Effective Date of the Plan. .............................................................................. 6
      F.    Sources of Information. ................................................................................... 6

II.   BACKGROUND. ..................................................................................................... 6
      A.    Overview of the Debtors. ................................................................................. 6
      B.    Financing History. ........................................................................................... 8
      C.    Real Property Leases. ...................................................................................... 8
      D.    Events Leading to the Debtors' Bankruptcy Filing. ....................................... 9

III.  THE CHAPTER 11 CASES. ................................................................................... 10
      A.    Wind-down of Business; Stay of Litigation. ................................................. 10
      B.    Significant Events During the Cases. ............................................................ 10
            1.    First Day Orders; Debtors' Professionals ............................................ 11
            2.    Postpetition Financing ......................................................................... 11
            3.    § 341 Meeting ...................................................................................... 11
            4.    WARN Act Adversary Proceeding ...................................................... 12
            5.    Claims Process and Bar Dates ............................................................. 12
            6.    Status of the Debtors ........................................................................... 12

IV.   THE PLAN. ............................................................................................................ 13
      A.    General. .......................................................................................................... 13
      B.    Funding for the Plan. ..................................................................................... 13
      C.    Classification and Treatment of Claims and Interests Generally. ................. 13
      D.    Classification and Treatment of Claims and Interests Under the Plan. ........ 14
            1.    Treatment of Administrative Expenses and Priority Tax Claims ........... 14
            2.    Allowed Class 1 Claims (Allowed Secured Claims of Prepetition
                  Lenders) .............................................................................................. 16
            3.    Allowed Class 2 Claims (Secured Tax Claims). .................................. 17
            4.    Allow Class 3 Claims (Other Secured Claims). ................................... 18
            5.    Allowed Class 4 Claims (Priority Non-Tax Claims) ............................ 19
            6.    Allowed Class 5 Claims (General Unsecured Claims) .......................... 19
            7.    Allowed Class 6 Interests. ................................................................... 21
      E.    Release of Liens and Perfection of Liens. ..................................................... 21
      F.    Post-Effective Date Governance. ................................................................... 21
      G.    Continuing Existence. .................................................................................... 22
      H.    The Plan Administrator. ................................................................................. 22
      I.    Exculpation of Plan Administrator. ............................................................... 23
      J.    Payment of Fees and Expenses to Plan Administrator. ................................. 24
      K.    Liquidation of Assets. .................................................................................... 24
      L.    Investments. ................................................................................................... 24

M. Accounts. .................................................................................................. 24
N. Plan Administrator Indemnification. ........................................................ 24
O. Resignation, Replacement, or Termination of Plan Administrator ...................... 24
P. Effectiveness of Securities, Instruments, and Agreements. ................................. 25
Q. Approval of Agreements. ........................................................................... 25
R. Cancellation and Surrender of Existing Securities. ........................................ 25
S. Entry of Final Decree. ............................................................................... 25
T. Retention of Rights to Pursue Causes of Action. .......................................... 25
U. Executory Contracts and Unexpired Leases. ................................................ 26
V. Conditions Precedent to Occurrence of the Effective Date of the Plan. ............... 26
W. Effect of Confirmation of the Plan. ........................................................... 27
    1. Releases .......................................................................................... 27
    2. Injunction ....................................................................................... 28
    3. Exculpation ..................................................................................... 29
    4. Binding Effect ................................................................................. 30
    5. Retention and Enforcement of Causes of Action .................................... 30
X. Distributions Under the Plan. .................................................................... 30
Y. Other Provisions of the Plan. ..................................................................... 30
    1. Setoffs ............................................................................................ 30
    2. Retention of Jurisdiction ................................................................... 31
    3. Modification to the Plan .................................................................... 31
    4. Withdrawal and Revocation of the Plan ............................................... 31

V. RISK FACTORS. ....................................................................................... 31
A. Risks Related to Projections and Estimates. ................................................ 31
B. Objection to Classifications. ..................................................................... 32
C. Risk of Nonconfirmation of the Plan. ........................................................ 32
D. Nonoccurrence of Effective Date of the Plan. .............................................. 32

VI. CONFIRMATION OF THE PLAN. .............................................................. 32
A. Notice to Holders of Claims and Interests. .................................................. 32
B. Voting Procedures and Requirements. ......................................................... 33
C. Solicitation Materials. .............................................................................. 33
D. Voting Procedures. ................................................................................... 34
E. Ballots Will Not Be Accepted by Facsimile or Email. ................................... 35
F. Acceptance. ............................................................................................. 36
G. Confirmation of the Plan. ......................................................................... 36
    1. The Best Interests Test ...................................................................... 36
    2. Feasibility ....................................................................................... 37
H. Non-Acceptance and Cram down. .............................................................. 37
    1. The Plan Is Fair and Equitable ........................................................... 37
    2. No Unfair Discrimination .................................................................. 38
I. Confirmation Hearing / Objections to Plan. ................................................. 38

VII. ALTERNATIVES TO CONFIRMATION OF THE PLAN. ............................... 39
A. Liquidation Under Chapter 7. .................................................................... 39
B. Alternative Plan. ...................................................................................... 39

Case 17-42571-rfn11 Doc 105 Filed 08/09/17 Entered 08/09/17 13:32:55 Page 7 of 47

VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES............................................ 39

IX.     CONCLUSION AND RECOMMENDATION.................................................................. 39

TABLES

Table I.C.:    Projected Treatment of Claims Against Interests in the Debtors

Table I.D.:    Summary of Voting Eligibility

APPENDICES

Appendix 1: Debtors' Chapter 11 Plan of Liquidation Dated as of August 2

Appendix 2: Organizational Chart

Appendix 3: Liquidation Analysis

Appendix 4: Retention and Enforcement of Causes of Action

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED
CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page vii**
AUS-6407724-1

## I.     INTRODUCTION AND SUMMARY.

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in the Disclosure Statement. References herein to a "fiscal" year refer to the fiscal year of the Debtors ending the last day of December in the calendar year indicated. Unless otherwise stated herein, section ("§") references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>").

### A.     The Solicitation.

On August 8, 2017, the Debtors Filed the Plan with the Court. The Debtors Filed the Disclosure Statement with the Court pursuant to § 1125 and in connection with the solicitation of the Plan.

On August 8, 2017, the Court conditionally determined that the Disclosure Statement contains "adequate information" in accordance with § 1125. Pursuant to § 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

The Court scheduled a hearing to consider final approval of the Disclosure Statement and Confirmation of the Plan on September 6, 2017 at 1:30 p.m. (Prevailing Central Time) in Fort Worth, Texas. The hearing may be adjourned from time to time without further notice other than by announcement in the Court on the scheduled date of such hearing. Any objections to Confirmation of the Plan must be in writing and must be Filed with the Clerk of the Court and served on the counsel listed below to ensure actual receipt by them on or before 5:00 Prevailing Central Time on September 1, 2017. Bankruptcy Rule 3007 governs the form of any such objection. Counsel on whom objections must be served are:

Counsel for the Debtors:

> Vickie L. Driver
> HUSCH BLACKWELL LLP
> 2100 Ross Ave., Suite 2000 Dallas, TX 75201
> 2001 Ross Avenue, Suite 2000
> Dallas, Texas 75201
> Phone: (214) 999-6100
> Fax: (214) 999-6170

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 1**

AUS-6407724-1

Office of the U.S. Trustee:

> Erin Schmidt
> Trial Attorney
> Office of the United States Trustee
> 1100 Commerce Street, Room 976
> Dallas, Texas 75242
> (214) 767-1075 (direct)
> Erin.Schmidt2@usdoj.gov

**B.      Recommendation.**

**THE DEBTORS URGE ALL CREDITORS TO VOTE TO ACCEPT THE PLAN.**

The Debtors believe that (i) the Plan provides the best possible result for the holders of Claims against the Debtors; (ii) with respect to each Impaired Class of Claims, the Distributions under the Plan are greater than the amounts that would be received if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code; and (iii) acceptance of the Plan is in the best interest of holders of Claims.

In arriving at their conclusions, the Debtors considered (i) the limited alternatives available to the Debtors to restructure their debts, (ii) the Debtors' estimated liquidation value, and (iii) the rights, in both payment and security position, of the Debtors' creditors.

**C.      Summary of the Plan.**

The majority of the Debtors' assets were foreclosed upon prior to the filing of the Cases. The Plan provides for the liquidation of the Debtors' remaining assets, including the pursuit of Causes of Action, and the distribution of the net proceeds to holders of Allowed Claims.

The execution and consummation of the Plan will be facilitated through the Plan Administrator. The Plan Administrator will be designated in the Plan Supplement to be Filed not less than ten (10) days prior to the Confirmation Hearing. The Plan Administrator shall be authorized pursuant to the terms of the Plan to act on behalf of the Debtors to administer and liquidate, as appropriate, the Debtors' assets, investigate and pursue Causes of Action, and make Distributions pursuant to the terms of the Plan.

Though the Plan is styled a "Joint Plan," the Plan as drafted consists of two (2) separate Plans – one for each Debtor. The Cases are not substantively consolidated and the liquidation of assets and treatment of Claims for each Debtor will be separately maintained and administered. Without limiting other provisions of the Plan, the Debtors specifically reserve the right to withdraw the Plan from consideration for confirmation as to both Debtors if the Plan is not confirmed as to both Debtors.

The following Table sets forth a summary reference guide to the classification and treatment of Allowed Claims against and Allowed Interests in the Debtors and each Class' voting eligibility and provides the Debtors' estimate of total Claims in each Class as of the Effective Date. The following Table is a summary only and is subject in all respects to the specific provisions of the Plan.

The Claims and Interests are as follows:

| CLASSES OF CLAIMS | | | | | | |
|---|---|---|---|---|---|---|
| Class | Type of Allowed Claim or Interest | Treatment | Status and Voting Eligibility | Estimated Recovery | Estimated Number of Holders | Estimated Total Dollar Amount of Claims |
| 1 | Secured Claims of Prepetition Lenders | Proceeds from the liquidation of the Prepetition Lenders pre-petition Collateral (excluding the Plan Administration Funding) will be distributed to the Prepetition Lenders after the payment in full of Allowed Administrative Claims, the DIP Administrative Claim, and Allowed Priority Tax Claims. | Impaired. Entitled to vote. | Unknown | 3 | FHI – $6.3MM[1]<br><br>UGH - $7.6MM[2] |
| 2 | Secured Tax Claims | At the sole discretion of the applicable Debtor or Liquidating Debtor (i) Cash equal to the unpaid portion of such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to Bankruptcy Code § 506(b) as soon as reasonably practicable after the later of (A) the Effective Date, (B) the date such Allowed Secured Tax Claim becomes Allowed, (C) the date such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business, and (D) such date as is mutually agreed upon by the applicable Debtor or Liquidating Debtor and the Holder of such Allowed Secured Tax Claim, (ii) pursuant to Bankruptcy Code § 1129(a)(9)(D), deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Secured Tax Claim, or (iii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Secured Tax Claim. | Unimpaired Deemed to accept the Plan. | 100% | 0 | None[3] |

---

[1] This is the full amount deemed owed; however, the Class 1 Secured Claims are only valued ta the value of the collateral securing the debt.  However, since the value of remaining collateral securing such Claims is difficult to ascertain, the full amount of the debt is listed.

[2] See Note 1 above.

[3] While proofs of claim were filed by certain taxing authorities asserting a secured claim, the collateral allegedly securing those claims has been repossessed by the purchase money security holders pre-petition and thus can be, at a maximum, Priority Tax Claims.  In addition, some were filed seeking payment of taxes relating to claims resolved in a bankruptcy case in Houston filed by the predecessor entity, and thus, the Debtors assert that these are not valid claims.

| | | | **CLASSES OF CLAIMS** | | | | |
|---|---|---|---|---|---|---|---|
| **Class** | **Type of Allowed Claim or Interest** | | **Treatment** | **Status and Voting Eligibility** | **Estimated Recovery** | **Estimated Number of Holders** | **Estimated Total Dollar Amount of Claims** |
| 3 | Other Secured Claims | | At the sole discretion of the applicable Debtor or Liquidating Debtor, as applicable, (i) Cash equal to the unpaid portion of such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to Bankruptcy Code § 506(b), or (ii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Other Secured Claim. | Unimpaired Deemed to accept the Plan. | 100% | 0 | $0[4] |
| 4 | Priority Non-Tax Claims | | After satisfaction in full of the DIP Administrative Claim, Allowed Priority Tax Claims, and Allowed Secured Claims in FHI Classes 1, 2 and 3, on account of such Allowed Priority Non-Tax Claim, payment in Cash of such holder's Pro-Rata share of all Distributions under the Plan (excluding any Distributions of the Plan Administration Funding) to be shared Pro-Rata with holders of all Allowed Priority Non-Tax Claims | Impaired. Entitled to vote. | Unknown | Unknown | Unknown |
| 5 | General Unsecured Claims | | Their Pro Rata share of all remaining property of the Debtors after (a) full satisfaction of the DIP Administrative Claim, Allowed Priority Claims, and Allowed Secured Claims in Classes 1, 2 and 3 (solely as to the Collateral applicable to such Class), and (b) payment of the Plan Administrative Funding | Impaired. Entitled to vote. | Unknown | FHI – 58  UGH - 287 | FHI - $2.66M  UGH - $33.4MM[5] |
| 6 | Interests in the Debtors | | No Distribution. | Impaired. Deemed to reject the Plan. | 0% | 700 | $0 |

The Debtors believe that the Plan treats the respective Classes of Claims and Interests fairly and equitably in observance of the absolute priority rule of § 1129(b)(2) of the Bankruptcy Code. The Debtors believe that the Plan provides each Creditor and Interest holder with at least as much as it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Set forth in detail elsewhere in the Disclosure Statement is a description of the technical aspects of the classification of Claims and Interests, the relative allocations of property to holders of such Claims and Interests, the methodology as to how such property is to be distributed, the

---

[4] Upon information and belief, all parties that filed a UCC financing statement that would be classified herein had capital leases or has repossessed their collateral and thus no secured claim remains.
[5] From each Debtor's Summary of Schedules.

risks inherent in the Plan, and the applicable bankruptcy and tax consequences of the liquidation of the Debtors. The Plan is the product of thorough discussions between and among the Debtors and other parties in interest and is based upon the Debtors' analysis of all Claims asserted or known as of the date hereof, an evaluation of the relative merits of potential conflicting Claims and a compromise of such Claims consistent with the goals of the Bankruptcy Code. The Debtors believe that the following overview of what Creditors and Interest holders will receive under the Plan will be helpful in your consideration of whether you wish to accept or reject the Plan. This summary does not purport to be complete and should only be relied upon for voting purposes when read in conjunction with the Plan and the Disclosure Statement in their entirety. In the event of any inconsistency between the Plan and the Plan Documents, on the one hand, and the Disclosure Statement, on the other hand, the Plan and the Plan Documents shall control and take precedence with respect to such inconsistency.

Some Creditors may hold Impaired Claims in more than one Class and must vote separately for each Class. If you hold Claims in more than one Class, or multiple Claims in the same Class, you must cast a separate vote based on each individual Claim.

A Ballot for the acceptance or rejection of the Plan is enclosed with the Solicitation Package mailed to holders of Claims that the Debtors believe are entitled to accept or reject the Plan.

Please do not return any other documentation with your Ballot. For further information on casting a Ballot to vote on the Plan, please see Section VI of the Disclosure Statement.

**D.     Votes Required for Acceptance; Confirmation.**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number of the claims of that class that actually cast ballots. The vote of a creditor may be disregarded if the Court determines, after notice and hearing, that the acceptance or rejection was not solicited or procured in good faith.

In addition to this voting requirement, § 1129 of the Bankruptcy Code requires that a plan be accepted by each class or that Court finds the Plan provides the holder with at least as much value on account of its claim as it would receive in a liquidation under chapter 7 of the Bankruptcy Code.

Confirmation will make the Plan binding upon the Debtors, holders of Claims against and Interests in the Debtors, and all other parties in interest regardless of whether they have accepted the Plan, and such holders of Claims and Interests will be prohibited from receiving payment from, or seeking recourse against, any assets that are distributed to other holders of Claims or Interests under the confirmed Plan. In addition, Confirmation will serve to enjoin holders of Claims or Interests from taking a wide variety of actions on account of any debt, Claim, liability, Interest or right that arose prior to the Confirmation Date.

Confirmation of the Plan will enjoin holders of Claims and Interests from seeking to enforce Claims against and Interests in the Debtors, whether or not a proof of Claim based on such debt is Filed or deemed Filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim accepted the Plan.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED
CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 5**

AUS-6407724-1

### E.      Effective Date of the Plan.

The Debtors will consummate the Plan upon the Effective Date.  The Effective Date will not occur unless certain conditions precedent occur.  The Confirmation Order may be vacated if the conditions to the occurrence of the Effective Date are not timely met or waived.

Because of the conditions to the occurrence of the Effective Date provided in the Plan, a delay will occur between Confirmation of the Plan and the Effective Date of the Plan.  There is no assurance that the conditions to the Effective Date will be fulfilled.  The Plan provides that it is a condition to the occurrence of the Effective Date of the Plan that each of the conditions precedent to the occurrence of the Effective Date has been satisfied.  Those conditions precedent are described more fully in Section 6.1 of the Plan.  If any condition to the Effective Date cannot be fulfilled or is not waived, the Effective Date will not occur.

The implementation of the Plan involves certain risks.  For a discussion of these risks, see Section V, entitled "RISK FACTORS."

### F.      Sources of Information.

Except as otherwise expressly indicated, the portions of the Disclosure Statement describing the Debtors, their businesses, property, and management, and the Plan have been prepared from information furnished by the Debtors.

The statements contained in the Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of the Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of the Disclosure Statement.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to any Creditor or Interest holder in connection with the Plan should be relied on other than as set forth in the Disclosure Statement.  In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in the Disclosure Statement.   Any such, additional representations or inducements should be reported immediately to the Debtors' counsel, Husch Blackwell LLP, 2001 Ross Avenue, Suite 2000, Dallas, Texas 75201, Attention: Vickie L. Driver.

## II.     BACKGROUND.

### A.      Overview of the Debtors.

FHI was originally incorporated in Oklahoma on August 18, 2003 under the name "Graymark Productions, Inc." and later changed its name to "Graymark Healthcare, Inc." on December 31, 2007, and then changed its name to its current name, Foundation Healthcare, Inc., on December 2, 2013.

FHI, a publicly traded Oklahoma corporation, was in the business of owning and managing facilities which operated in the surgical segment of the healthcare industry.  At the peak of its operations, FHI owned and/or managed five (5) surgical hospitals, nine (9)

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 6**

AUS-6407724-1

ambulatory surgical centers, and three (3) outpatient departments in six (6) states in the Southeastern United States. The facilities provided care for patients seeking general surgeries and specialty surgeries such as orthopedics, neurosurgery, pain management, podiatry, gynecology, optometry, gastroenterology, pediatric ENT, wound care, sleep management, radiology, imaging, and other ancillary services. FHI did not have any direct hospital operations or patients; however, FHI provided leadership, management, central back office, and organization services to many of its related affiliates, including UGH.

FHI was publicly traded under the symbol FDNH.

Foundation Surgical Hospital Holdings, LLC ("FSHH"), at the time a third-tier subsidiary of FHI, purchased all the partnership interests in University General Hospital, LP and substantially all the assets used in the Hospital's business through the bankruptcy of University General Health System, Inc. in the United States Bankruptcy Court for the Southern District of Texas. The sale closed on December 31, 2015.

Just prior to the purchase, Foundation Surgical Hospital Affiliates, LLC ("FSHA"), a second-tier subsidiary of FHI, formed Foundation Hospital General of Houston, LLC ("FHGH") to acquire the general partnership interests in University General Hospital, LP. On or about January 25, 2016, University General Hospital, LP converted to a Texas limited liability company, University Hospital General, LLC, one of the Debtors herein.

UGH is 11% owned by seven (7) doctors or doctor-owned entities, each owning different numbers of membership units in Class A, one of two classes. Prior to the Petition Date, the majority of the Class A and Class B membership units comprising a total 88.99% ownership interest in UGH were transferred by FSHH to FSHA. The remaining 0.01% ownership interest holder and Class B member of UGH is FHGH.

UGH, which did business as Foundation Surgical Hospital of Houston, was a surgically focused, 69-bed hospital located in the Texas Medical Center at 7501 Fannin Street in Houston, Texas (the "Hospital"). The Hospital opened under prior ownership/management in 2006. Prior to its closure in January 2017, UGH offered a full array of equipment and services including inpatient and outpatient medical treatments and surgeries, six state-of-the-art operating suites, two cardiac catheterization labs, an endoscopy suite, pulmonary medicine, diagnostic imaging, laboratory, wound care and hyperbarics, as well as other ancillary services. During operation, the Hospital's medical services included bariatric, orthopedic, neuro/spine, and general surgery, as well as gynecology, interventional cardiology, podiatry and interventional pain management.

As of December 2016, the Hospital, located in the Texas Medical Center in Houston, Texas, had average daily census of 7.6 inpatients per day and a 3,182.3 average monthly number of outpatients. UGH's leased facility is comprised of over 113,000 useable square feet and is situated on approximately 0.94 acres. Until mid-January 2017, when the Hospital began the process of closing its doors, UGH had approximately two hundred and fifty-two (252) non-insider clinical and non-clinical employees.

Pre-petition, the Debtors' central billing office services were provided by Foundation Surgical Hospital Management, LLC ("FSHM") in accordance with that certain Management Agreement dated effective January 1, 2016 with FSHM. In exchange for these services, the Debtors provided FSHM a management fee of 3% net monthly collected revenues. FSHM,

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 7**

AUS-6407724-1

FSHA, and FHGH, are wholly owned subsidiaries of FHI. As described below, FHI no longer holds an interest, either directly or indirectly, in FSHH. Attached hereto as **Appendix "2,"** is an organizational chart illustrating the relevant relationships.

### B. Financing History.

Pursuant to the FHI Prepetition Credit Agreement, the Prepetition Lenders made certain loans to FHI, which loans are evidenced by, without limitation, the FHI Prepetition Note. Contemporaneously with the extension of the loans by the Prepetition Lenders to FHI under the FHI Prepetition Credit Agreement, FHI made a loan in the principal amount of $12,605,000.00 to UGH (the "Intercompany Loan"). The Intercompany Loan is evidenced by the Intercompany Note. UGH's obligations to FHI under the Intercompany Note are secured by the Intercompany Security Agreement, pursuant to which UGH granted FHI a security interest encumbering substantially all of UGH's assets. FHI's obligations to the Prepetition Agent and Prepetition Lenders under the Credit Agreement and FHI Note were secured by, among other things, a pledge of FHI's interest in the Intercompany Indebtedness Documents. Additionally, FHI assigned the Intercompany Note to the Prepetition Agent on December 31, 2015.

As of the Petition Date, the Prepetition Agent asserts that the aggregate amount of not less than $6,284,895.28 was due and owing by FHI to the Prepetition Lenders under the FHI Prepetition Indebtedness Documents (the "FHI Prepetition Indebtedness"). As of the Petition Date, the Prepetition Agent asserts that the aggregate amount of not less than approximately $7,622,000.00 was due and owing by UGH to the Prepetition Lenders under the Intercompany Indebtedness Documents, (the "UGH Prepetition Indebtedness").

On December 30 2016, TCB, as administrative agent, issued letters to FHI and UGH stating that due to certain events of default by FHI under the FHI Prepetition Credit Agreement with TCB, TCB directed all payments under the Intercompany Note to be made to TCB and not FHI pursuant to those documents.

Prior to the Petition Date, the Prepetition Agent foreclosed on certain collateral in consensual foreclosure transactions. The consensual foreclosure transactions included the sale of all equity interests in FSHH to Scout Crockett, Inc. and the retention of the Intercompany Note and related rights by the Prepetition Agent in partial satisfaction of the obligations under the FHI Prepetition Credit Agreement. The consensual foreclosure transactions resulted in an aggregate reduction of $29,800,000.00 in the secured indebtedness owed under the FHI Prepetition Credit Agreement. As a result of the foreclosure transactions, FHI no longer holds an interest, either directly or indirectly, in FSHH.

The Debtors are party to those certain equipment lease agreements with First Financial Corporate Leasing, LLC, Med One Capital Funding, LLC, and Toshiba American Medical Credit, a program of Toshiba America Medical Systems, Inc. whereby the Debtors leased certain medical equipment (the "Equipment Leases"). As of the Petition Date, UGH owes an aggregate of approximately $2,359,859.04 and FHI owes an aggregate of approximately $80,000.00 under the Equipment Leases.

### C. Real Property Leases.

FHI leases corporate office space located at 13900 N. Portland, Oklahoma City, Oklahoma 73134 from Memorial Hefner Parkway, LLC, an Oklahoma limited liability company

pursuant to that certain *Office Lease Agreement* dated January 18, 2016 (the "FHI Lease"). The FHI Lease's initial term was a period of sixty-three (63) months commencing on May 1, 2016. The FHI Lease included a $40,000.00 security deposit, and increasing monthly base rent ranging from $40,037.09 to $42,201.25. FHI is also responsible for certain additional costs for items such as insurance, taxes, and landscape services. The FHI Lease is current as of the Petition Date.

UGH leases the real property and fixtures on which the Hospital operates from Cambridge Properties pursuant to the terms of that certain *Lease Agreement* dated July 21, 2005, as thereafter amended (the "UGH Lease"). The UGH Lease's initial term was extended through July 20, 2026, with a monthly rent payment in the amount of $227,269 for the Hospital and the Special Use Common Areas plus approximately $100 per month for the Compactor Area and $25,575 per month for 165 Garage Parking Spaces.

As of the Petition Date, UGH's payments due under the UGH Lease for approximately five (5) months' base rent, special use common areas, projected general operating expenses, water, night time security, garage parking, valet spaces, reserved parking, and basement parking in the amount of $1,629,000.00 has not been paid.

### D.    Events Leading to the Debtors' Bankruptcy Filing.

As of June 30, 2016, FHI had extensive accumulated and working capital deficits. As a result, FHI disclosed in its required SEC filings that it may not be able to meets its obligations as they came due over the next year. At the time, FHI indicated that it planned to meet the projected cash flow shortage from the sale of certain assets and projected increases in revenues and decreases in expenses. Because of these uncertainties, FHI issued a "going concern statement," specifically that: "[w]e will require significant amounts of additional financing to execute our business plan and fund our other liquidity needs. If our operating results do not meet or exceed our projections, we may be unable to continue operations and could be forced to substantially curtail operations or cease operations all together."

FHI was unable to address the cash flow shortage either through the sale of assets, increase in revenues, decrease in expenses, or by reaching additional modifications or extension agreements with the Prepetition Lenders. On February 3, 2017, FHI filed Form 15 Certification and Notice of Termination of Registration with the United States Securities and Exchange Commission to voluntarily deregister its common stock. FHI has ceased to conduct business operations and has no employees. FHI currently only has a contracted interim Chief Financial Officer and a contracted Chief Restructuring Officer, and one part time assistant.

After the purchase, when UGH attempted to re-syndicate the Hospital and attract new physician partners, there was little or no interest in the market due to the existence of other high profile struggling or failing physician-owned hospital systems. Because UGH was unable to attract physician partners with the types of surgical cases that would provide higher insurance reimbursement rates, operational income also failed to meet expectations. Furthermore, UGH could not access favorable managed care contracts as a sole provider in the Houston area because it was unaffiliated with any of the larger hospital systems. FSHH had to supplement UGH's cash flow to maintain operations.

Moreover, in September 2016, UGH voluntarily suspended its laboratory license/certification due to the inability to fund adequate supplies and the results of a state and federal investigation finding multiple irregularities. Because UGH could not run its lab in-house, UGH had to contract with Methodist Pathology Associates, PLLC for laboratory services at 2-3 times the in-house cost, resulting in even higher expenses for the struggling hospital. This led to an aggressive buildup of payables over the year and UGH's inability to timely pay certain critical vendors.

Finally, in November and December 2016, UGH also experienced an unusually high level of employee medical claims that were out of network, and given that UGH is self-insured and has a stop-loss of $125,000 per claimant per year, this aberrational expense hit UGH exceptionally hard.

As UGH did not generate sufficient revenue to operate the Hospital and to service its debt, UGH began exploring its business options. To address exigent financial and operational issues, the Debtors retained Ankura Consulting Group ("Ankura") effective December 16, 2016, to assist the Debtors to, among other things, create short-term budgets, negotiate appropriate waivers and forbearances, and assess the Debtors' available assets and options by which to improve the Debtors' performance. When a potential sale of the operating Hospital fell through, UGH did not have access to sufficient funds to continue to safely operate the Hospital and therefore had no choice but to close the Hospital. UGH, with the help of Ankura, took every care to maintain patient safety and privacy while closing the Hospital in an orderly manner.

## III.    THE CHAPTER 11 CASES.

### A.    Wind-down of Business; Stay of Litigation.

The Debtors Filed the petitions commencing these Cases on June 21, 2017.

Since the Petition Date, the Debtors have continued to manage their businesses as Debtors-in-possession subject to the supervision of the Court and in accordance with the Bankruptcy Code. The Debtors are authorized to manage their businesses in the ordinary course of business; but transactions out of the ordinary course of business must receive prior Court approval. In addition, the Court supervised and approved the Debtors' employment of certain Professionals, including attorneys and restructuring advisors.

The Debtors Filed for Chapter 11 protection to accomplish two main goals: 1) to ensure that patient records were secured and stored and eventually destroyed in a way that allowed former patients to access or obtain copies such records and protect former patients' personal health information from indiscriminate disclosure or improper disposal; and 2) to fund medical insurance benefits claims arising from the self-funded health insurance plan provided to the Debtors' former employees pre-petition; for which former employees paid a portion of the premiums. Along with these primary objectives, the Debtors seek to continue the orderly wind-down of their businesses and appropriate administration and distribution of assets to creditors.

### B.    Significant Events During the Cases.

The following is a brief description of some of the major events during the Cases.

### 1. First Day Orders; Debtors' Professionals.

On June 22, 2017, the Debtors Filed certain so-called "first day motions" seeking entry of orders (i) permitting joint administration of these Cases; (ii) approving certain procedures to protect patient privacy and permit the filing of certain documents under permanent seal; (iii) approving post-petition secured financing and the use of cash collateral; (iv) authorizing the payment of pre-petition medical insurance benefits; (v) approving the continued use of the existing cash management system; (vi) appointing Donlin, Recano & Company, Inc. as the Debtors' claims and noticing agent;

A hearing to consider the first day motions was held on July 5, 2017.  The Court entered orders (i) permitting joint administration of these Cases (Docket No. 39); (ii) approving certain procedures to protect patient privacy and permit the filing of certain documents under permanent seal (Docket No. 47); (iii) approving post-petition secured financing and the use of cash collateral on an interim basis (Docket No. 48); (iv) approving the continued use of the existing cash management system (Docket No. 49); and (v) appointing Donlin, Recano & Company, Inc. as the Debtors' claims and noticing agent (Docket No. 50).  The hearing on the motion for an order authorizing the payment of pre-petition medical insurance benefits was adjourned to a later hearing dated and granted at that later hearing date (Docket No. 71).

The Debtors also Filed (i) an application to retain the services of Husch Blackwell LLP as their bankruptcy counsel (Application at Docket No. 40, and the subsequent order approving the application at Docket No. 67), (ii) an application to retain the services of Ankura as their restructuring and financial advisor and Michael S. Miller as their Chief Restructuring Officer (Application at Docket No. 41, and the subsequent order approving the application at Docket No. 68), and (iii) an application to retain the services of Eide Bailey LLP as the Debtors' accountant for tax preparation (Application at Docket No. 42, and the subsequent order approving the application at Docket No. 69).

### 2. Postpetition Financing.

On July 20, 2017, the Court entered a final order, pursuant to § 364(c) and (d) (the "Final DIP Order") (Docket No. 72), granting the Debtors authority to obtain post-petition financing from the Prepetition Lenders (in their capacity as lenders of the DIP loan, the "DIP Lenders"), secured by superpriority liens on substantially all of the Debtors' assets but excluding the claims and causes action that arise under Chapter 5 of the Bankruptcy Code (the "DIP Loan").  The DIP Loan provided for up to the maximum principal amount of $1,250,000.00.

### 3. § 341 Meeting.

The Office of the United States Trustee scheduled the official meeting of creditors in the Cases pursuant to § 341 in Fort Worth on July 28, 2017 at 9:30 a.m.[6]  The § 341 meeting was called and continued at 9:30 a.m. and called and concluded at 1:00 p.m.  No creditors appeared at the § 341 meeting except TCB.

---

[6] Due to some confusion on the UGH docket regarding the time of the meeting of creditors for UGH, representatives for the Debtors made themselves available at both 9:30 a.m. and 1:00 p.m. on July 28, 2017.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 11**

AUS-6407724-1

### 4. WARN Act Adversary Proceeding

On July 3, 2017, certain of UGH's former employees filed an adversary proceeding (the "Lawsuit") against UGH for claims pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq., (the "WARN Act") seeking damages for the alleged failure of UGH to provide 60 days advance written notice of termination. The Plaintiffs seek to certify a class in this Lawsuit and claim to be entitled to a priority claim for their damages under Bankruptcy Code § 507(a)(4). While Plaintiffs believe that they will prevail in their claims in the Lawsuit, UGH believes that it has valid defenses to the claims made in the Lawsuit. As of the date of this Disclosure Statement, the Plaintiffs and UGH have agreed to stay the Lawsuit so as to not incur expenses to pursue the Lawsuit due to the lack of funds to pay the Plaintiffs claims.

### 5. Claims Process and Bar Dates.

The Debtors Filed their Schedules and SOFAS on July 6, 2017.

The Court established (i) October 26, 2017 as the deadline for Creditors to File proofs of Claim; and (ii) December 26, 2017 as the deadline for Governmental Units to File Claims.

To the extent funds are available for distribution, the Debtors or the Plan Administrator, as applicable, will review Claims Filed and will develop and analyze a database of all Claims asserted against the Debtors. The Debtors or the Plan Administrator, as applicable, will analyze proofs of Claim to determine whether to object to the allowance of such Claims.

The Claims asserted against the Debtors may be materially in excess of the total amount of Allowed Claims estimated by the Debtors in connection with the development of the Plan because, among other things, certain Claims (i) are Filed in duplicate; (ii) consist of amendments to previously Filed Claims; (iii) assert Claims in excess of the amount actually owed; (iv) do not allege an obligation of either Debtor; (v) assert contingent Claims against the Debtors; (vi) were Filed after the applicable Bar Date; or (vii) include postpetition interest and other disallowable amounts. To the extent funds are available for distribution, the Debtors or the Plan Administrator, as applicable, intends to File objections to, among others, those Claims falling into the foregoing categories.

### 6. Status of the Debtors.

The Debtors have continued to manage the orderly wind down of their businesses as funded by the DIP Loan and pursuant to budgets presented to the Court, and have generally met their post-petition obligations incurred during the course of the Cases. As the Debtors' are not operational, the Debtors' post-petition operations related primarily to the wind down of the businesses and the administration of the Cases.

As set forth in the Liquidation Analysis attached hereto as **Appendix "3,"** the Debtors estimate the amount available to unsecured creditors through an orderly chapter 7 liquidation is $0. The Debtors anticipate significantly less would be realized by the holders of Allowed Administrative Expense in a chapter 7 bankruptcy case.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 12**

AUS-6407724-1

## IV.    THE PLAN.

The following is a summary of certain significant provisions of the Plan.  This summary is qualified in its entirety by reference to the more detailed information set forth in the Plan.  To the extent the terms of the Disclosure Statement vary from the terms of the Plan or the Plan Documents, the terms of the Plan shall control.

### A.    General.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of itself and its creditors and interest holders.

Formulation of a plan is the principal objective of chapter 11.  In general, a plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to the reorganization of the debtor.  Alternatively, the Bankruptcy Code allows a debtor to file a plan of liquidation which allows for the orderly liquidation of the assets of the debtor.

Chapter 11 does not require each holder of a claim or interest to vote in favor of the plan for the Court to confirm the plan.  However, the plan must be accepted by the holders of at least one class of claims that is impaired without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

Distributions to be made under the plan will be made after confirmation of the plan, on the effective date or as soon thereafter as is practicable, or at such other time or times specified in the plan.

### B.    Funding for the Plan.

The Plan proposed by the Debtors is a liquidating plan.  The Plan will be funded, in large part, through liquidation of the Debtors' assets, including pursuit of Causes of Action.

The Debtors' assets are set forth in the Schedules and SOFAS.  In summary, the primary assets as of the Petition Date are Causes of Action, anticipated tax refunds, potentially a piece of real estate, accounts receivable, and miscellaneous office equipment, as well as a management fee buyout and management contract.  As described herein, other assets of the Debtors were foreclosed upon by the Prepetition Lenders pre-petition.

### C.    Classification and Treatment of Claims and Interests Generally.

Section 1123(a)(1) requires the Plan classify all Claims (other than Administrative Expenses and Priority Tax Claims) and Interests.  Section 1122 provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe they classified all Claims and Interests in compliance with the provisions of § 1122.  If a Claim or Interest holder challenges such classification of Claims or Interests and the Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Court, intends to make

such reasonable modifications to the classification of Claims or Interests under the Plan to provide for whatever classification might be required by the Court.

Except to the extent such modification of classification adversely affects the treatment of a holder of a Claim or Interest and requires resolicitation, acceptance of the Plan by any holder of a Claim or Interest pursuant to this solicitation will be deemed to be a consent to the Plan's treatment of such holder of a Claim or Interest regardless of the Class to which such holder of a Claim or Interest is ultimately deemed to belong.

The Bankruptcy Code also requires the Plan provide the same treatment for each Claim or Interest in a particular Class, unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe the Plan complies with this standard. If the Court finds the Plan does not comply with this standard, it could deny Confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

The Plan categorizes Claims against and Interests in the Debtors under the Plan into separate Classes. In accordance with the Bankruptcy Code, Administrative Expenses and Priority Tax Claims are not classified into Classes. The Plan also provides that expenses properly incurred by the Debtors during the Cases will be paid in full and specifies the treatment proposed for the Claims and Interests in each Class.

### D.    Classification and Treatment of Claims and Interests Under the Plan.

#### 1.    *Treatment of Administrative Expenses and Priority Tax Claims.*

##### (a)    *Treatment of Allowed Administrative Expenses.*

Allowed Administrative Expenses against the Debtors will be paid in full, in Cash, on the Effective Date, as soon as practicable after the Effective Date, or when an Administrative Expense becomes Allowed.

The DIP Loan is deemed Allowed as an Administrative Expense Claim in the amount of $ 1,250,000.00 plus all interest and fees accrued thereunder (the "DIP Administrative Claim"). The DIP Administrative Agent shall receive, on behalf of the DIP Lenders, on account of the DIP Administrative Claim, payment in Cash of all Distributions under the Plan (excluding any Distributions of the Plan Administration Funding) until payment in full of the DIP Administrative Claim. Provided, however, to the extent that any portion of the DIP Administrative Claim is paid with proceeds from the liquidation of Collateral securing the FHI Prepetition Indebtedness or the UGH Prepetition Indebtedness, any proceeds that are later received from the liquidation of Collateral securing only the DIP Loan shall be deemed to have been used to pay the DIP Administrative Claim and, subject only to the provisions of Section 5.1 of the Plan, (i) proceeds from the prior liquidation of Collateral securing the FHI Prepetition Indebtedness will be paid as Distributions to FHI Class 1, and (ii) proceeds from the prior liquidation of Collateral securing the UGH Prepetition Indebtedness will be paid as Distributions to UGH Class 1.

On or before the Effective Date, the Debtors shall pay all amounts owing to the Professionals for all outstanding Professional Claims that have been awarded by the Court but which were unpaid as of the Effective Date. On or prior to the Administrative Expense Claim

Bar Date, each Professional required to do so shall File with the Court a final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date. Objections to applications of Professional final fee applications must be Filed and served on the Plan Administrator and the professionals to whose application the objections are addressed no later than twenty-four (24) days after filing of the relevant final fee application. The Liquidating Debtors shall pay any outstanding amounts owed to a Professional within ten (10) days after entry of a Final Order with respect to such Professional's final fee application. Any amounts previously paid to a Professional, but not supported by the Final order with respect to such Professional's final fee application, shall be paid directly to the DIP Administrative Agent, on account of the DIP Administrative Claim, within ten (10) days after entry of such Final Order.

Each holder of an Allowed Administrative Expense Claim other than the DIP Administrative Claim and Professional Claims, including any Post-Petition Tax Claim, shall receive 100% of the unpaid Allowed amount of such Administrative Expense Claim in Cash in the ordinary course of business or as soon as reasonably practicable after the later of (a) the Effective Date, (b) payment in full of the DIP Administrative Claim, (c) the date on which such Administrative Expense Claim becomes Allowed, or (d) such date as is mutually agreed upon by the applicable Debtor or Liquidating Debtor and the Holder of such Allowed Administrative Expense Claim. To the extent that the holder of a Post-Petition Tax Claim holds a lien to secure its Claim under applicable state law, the holder of such Claim shall retain its lien until its Allowed Claim has been paid in full.

Holders of Administrative Expense Claims (including, without limitation, holders of Professional Claims or Post-Petition Tax Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable Administrative Expense Claim Bar Date or Post-Petition Tax Claim Bar Date are forever barred from asserting such Claims against the Debtors, the Liquidating Debtors, or any of their respective property.

Allowed Administrative Expense Claims and Allowed Professional Claims, but excluding the DIP Administrative Claim, shall be paid from the proceeds of the DIP Loan and Cash Collateral.

Notwithstanding any other provision of the Plan, all fees, expenses, and other compensation arising after the Effective Date and due and payable to professionals retained by the Plan Administrator shall be paid by the Plan Administrator (a) first, from the Plan Administration Funding, and (b) thereafter, from the remaining assets of the Liquidating Debtors subject to the provisions of Section 7.7 of the Plan.

As of the Effective Date, the Debtors estimate Administrative Expenses asserted against the Debtors will total approximately $0.00 (which amount excludes Professional Claims paid during the course of the Cases).

### (b)     Treatment of Allowed Priority Tax Claims.

Each holder of an Allowed Priority Tax Claim shall receive, after payment in full of the DIP Administrative Claim, on account of such Allowed Priority Tax Claim, payment in Cash of such holder's Pro-Rata share of all Distributions under the Plan (excluding any Distributions of the Plan Administration Funding) to be shared Pro-Rata with holders of all Allowed Priority Tax Claims until the payment in full of all Allowed Priority Tax Claims.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 15**

AUS-6407724-1

To the extent interest is required to be paid on any Allowed Priority Tax Claim, the rate of such interest shall be the rate determined under applicable non-bankruptcy law. Provided, however, that any Claim or demand for payment of a penalty (other than a penalty of the type specified in § 507(a)(8)(G)of the Bankruptcy Code) shall be disallowed pursuant to the Plan, and the Holder of an Allowed Priority Tax Claim shall not be allowed to assess or attempt to collect such penalty from the Debtors, the Liquidating Debtors or their Estates, or their respective property.

### (c) *Payment of Statutory Fees.*

All fees payable on or before the Effective Date (a) pursuant to 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing; and (b) to the United States Trustee, shall be paid by the Debtors on or before the Effective Date. All such fees payable after the Effective Date shall be paid by the Plan Administrator.

### (d) *Disallowance of Special Taxes*

The issuance, transfer, or exchange of a security as defined under the Bankruptcy Code or applicable law, or the making or delivery of any instrument of transfer under the Plan shall not be taxed under any state or local law imposing a stamp tax or similar tax as provided in § 1146 of the Bankruptcy Code.

### 2. *Allowed Class 1 Claims (Allowed Secured Claims of Prepetition Lenders).*

Class 1 shall consist of two subclasses, FHI Class 1 and UGH Class 1:

FHI Class 1: FHI Class 1 consists of the Allowed Secured Claims of Prepetition Lenders against FHI.

UGH Class 1: UGH Class 1 consists of the Allowed Secured Claims of Prepetition Lenders against UGH.

### (a) *Treatment of FHI Class 1.*

On the Effective Date or as soon as reasonably practicable thereafter, in full settlement, release and discharge of the Allowed Secured Claims of Prepetition Lenders against FHI, the Prepetition Agent shall receive, on behalf of such Prepetition Lenders, the proceeds of the liquidation of the Collateral securing the FHI Prepetition Indebtedness (excluding the Plan Administration Funding) after the payment in full of Allowed Administrative Claims, the DIP Administrative Claim, and Allowed Priority Tax Claims. Any amount of the FHI Prepetition Indebtedness that remains unpaid after the liquidation of such Collateral shall be treated as a Deficiency Claim to be paid under FHI Class 5.

FHI Class 1 is Impaired under the Plan, and holders of Claims in FHI Class 1 are entitled to vote to accept or reject the Plan.

The estimated recovery for Allowed FHI Class 1 Claims is unknown.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 16**

AUS-6407724-1

*(b)* **Treatment of UGH Class 1.**

On the Effective Date or as soon as reasonably practicable thereafter, in full settlement, release and discharge of the Allowed Secured Claims of Prepetition Lenders against UGH, the Prepetition Agent shall receive, on behalf of such Prepetition Lenders, the proceeds of the liquidation of the Collateral securing the Intercompany Indebtedness Documents (excluding the Plan Administration Funding) after the payment in full of Allowed Administrative Claims, the DIP Administrative Claim, and Allowed Priority Tax Claims. Any amount of the UGH Prepetition Indebtedness that remains unpaid after the liquidation of such Collateral shall be treated as a Deficiency Claim to be paid under UGH Class 5.

UGH Class 1 is Impaired under the Plan, and holders of Claims in UGH Class 1 are entitled to vote to accept or reject the Plan.

The estimated recovery for Allowed UGH Class 1 Claims is unknown.

*(c)* **Additional Plan Administration Funding.**

Notwithstanding the foregoing, prior to any Distribution to the Prepetition Lenders on account of the FHI and UGH Class 1 Claims, the proceeds of the liquidation of the Collateral securing the FHI Prepetition Indebtedness and UGH Prepetition Indebtedness shall be used to fund the Additional Plan Administration Funding. Funding of the Additional Plan Administration Funding shall be made equally from the proceeds of the liquidation of the Collateral securing the FHI Prepetition Indebtedness and the Collateral securing the Intercompany Indebtedness Documents. Upon funding of the total amount of the Additional Plan Administration Funding, all proceeds of the liquidation of the Collateral Securing the FHI Prepetition Indebtedness and the Intercompany Indebtedness Documents shall be distributed to the Prepetition Lenders on account of their FHI and UGH Class 1 Claims, respectively, until payment in full of such Claims.

*(d)* **Aggregate Distribution Celling.**

Notwithstanding the foregoing, the total collective Distributions made to the Prepetition Agent (on behalf of the Prepetition Lenders) on account of the Secured Claims in FHI Class and UGH Class 1 shall not exceed $7.8 million (exclusive of amounts paid to satisfy the DIP Administrative Claim). Upon the Prepetition Agent's receipt of an aggregate of $7.8 million in collective Distributions on account of the Secured Claims in FHI Class 1 and UGH Class 1, (a) any remaining, unpaid portion of the FHI Prepetition Indebtedness shall be deemed a Deficiency Claim under FHI Class 5, and (b) any remaining, unpaid portion of the UGH Prepetition Indebtedness shall be deemed a Deficiency Claim under UGH Class 5.

*3.* **Allowed Class 2 Claims (Secured Tax Claims).**

Class 2 shall consist of all Allowed Secured Tax Claims. Each Secured Tax Claim in Class 2 shall be assigned to a separate subclass, which shall be treated as a class in the Case in which such Secured Tax Claim is Allowed.

If there is more than one Allowed Secured Tax Claim, then each Allowed Secured Tax Claim shall be classified in a separate subclass (to be designated FHI Class 2A, 2B, 2C, etc., and UGH Class 2A, 2B, 2C, etc.).

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED**
**CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 17**

AUS-6407724-1

Unless otherwise provided for pursuant to an order of the Court, each Holder of an Allowed Secured Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, either: (a) at the sole discretion of the applicable Debtor or Liquidating Debtor (i) Cash equal to the unpaid portion of such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to Bankruptcy Code § 506(b) as soon as reasonably practicable after the later of (A) the Effective Date, (B) the date such Allowed Secured Tax Claim becomes Allowed, (C) the date such Allowed Secured Tax Claim becomes due and owing in the ordinary course of business, and (D) such date as is mutually agreed upon by the applicable Debtor or Liquidating Debtor and the Holder of such Allowed Secured Tax Claim, (ii) pursuant to Bankruptcy Code § 1129(a)(9)(D), deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Secured Tax Claim, or (iii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Secured Tax Claim; or (b) such other treatment as may be agreed to by the applicable Debtor and the Holder of such Allowed Secured Tax Claim in writing.

Each subclass in Class 2 is Unimpaired under the Plan, and holders of Claims in a subclass of Class 2 are conclusively presumed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan.

The estimated recovery for Allowed Secured Tax Claims in Class 2 is 100%.

### 4. Allow Class 3 Claims (Other Secured Claims).

Class 3 shall consist of all Allowed Secured Claims other than those in Classes 1 and 2. Each Other Secured Claim in Class 3 shall be assigned to a separate subclass, which shall be treated as a class in the Case in which such Other Secured Claim is Allowed.

If there is more than one Allowed Other Secured Claim, then each Allowed Other Secured Claim shall be classified in a separate subclass (to be designated FHI Class 3A, 3B, 3C, etc., and UGH Class 3A, 3B, 3C, etc.).

Unless otherwise provided for pursuant to an order of the Court, each Holder of an Allowed Other Secured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim as soon as reasonably practicable after the later of (a) the Effective Date, (b) the date such Other Secured Claim becomes Allowed, (c) the date such Allowed Other Secured Claim becomes due and owing in the ordinary course of business, and (d) such date as is mutually agreed upon by the applicable Debtor or Liquidating Debtor and the Holder of such Allowed Other Secured Claim either: (a) at the sole discretion of the applicable Debtor or Liquidating Debtor, as applicable, (i) Cash equal to the unpaid portion of such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to Bankruptcy Code § 506(b), or (ii) reinstatement of the legal, equitable, and contractual rights of the Holder of such Allowed Other Secured Claim; or (b) such other treatment as may be agreed to by the applicable Debtor and the Holder of such Allowed Other Secured Claim in writing.

Each subclass in Class 3 is Unimpaired under the Plan, and holders of Claims in a subclass of Class 3 are conclusively presumed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan.

The estimated recovery for Allowed Other Secured Claims in Class 3 is 100%.

### 5. *Allowed Class 4 Claims (Priority Non-Tax Claims).*

Class 4 shall consist of all Allowed Priority Non-Tax Claims. Class 4 shall consist of two subclasses, FHI Class 4 and UGH Class 4:

> FHI Class 4 - Allowed Priority Non-Tax Claims: FHI Class 4 consists of all Allowed Priority Non-Tax Claims against FHI.

> UGH Class 4 - Allowed Priority Non-Tax Claims: UGH Class 4 consists of all Allowed Priority Non-Tax Claims against UGH.

Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each holder of an Allowed Priority Non-Tax Claim shall receive, after payment in full of the DIP Administrative Claim, Allowed Priority Tax Claims, and Allowed Secured Claims in Classes 1, 2 and 3, on account of such Allowed Priority Non-Tax Claim, payment in Cash of such holder's Pro-Rata share of all Distributions under the Plan (excluding any Distributions of the Plan Administration Funding) to be shared Pro-Rata with holders of all Allowed Priority Non-Tax Claims until all Allowed Priority Non-Tax Claims have been paid in full.

Class 4 is Impaired under the Plan, and holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

The estimated recovery for Allowed Class 4 Claims is unknown.

### 6. *Allowed Class 5 Claims (General Unsecured Claims).*

Class 5 shall consist of two subclasses, FHI Class 5 and UGH Class 5.

> FHI Class 5 –Allowed General Unsecured Claims: FHI Class 5 consists of Allowed General Unsecured Claims against FHI.

> UGH Class 5 –Allowed General Unsecured Claims: UGH Class 5 consists of Allowed General Unsecured Claims against UGH.

#### (a) *Treatment of FHI Class 5.*

Unless otherwise provided for pursuant to an order of the Court or in the paragraph below, each holder of an Allowed General Unsecured Claim in FHI Class 5 shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, their Pro Rata share of all remaining property of FHI after (a) payment of the DIP Administrative Claim, Allowed Priority Claims, and Allowed Secured Claims in FHI Classes 1, 2 and 3 (solely as to the Collateral applicable to such Class), and (b) payment of the Plan Administrative Funding, until all Allowed General Unsecured Claims in FHI Class 5 are paid in full or all of the property of FHI's Estate has been distributed. Distributions to holders of

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED
CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 19**

AUS-6407724-1

Allowed FHI Class 5 Claims shall be made at such time or times that the Plan Administrator, in his discretion, determines that a Distribution to holders of Allowed FHI Class 5 Claims is appropriate, taking into consideration the number and amount of FHI Class 5 Claims that remain in dispute.

While FHI Class 5 shall include the Deficiency Claim of the Prepetition Lenders against FHI not otherwise satisfied in FHI Class 1, Distributions to the Prepetition Agent on account of such FHI Class 5 Deficiency Claim shall in no event exceed 50% of the total Distributions made to Holders of Allowed FHI Class 5 Claims until such time as all Allowed General Unsecured Claims that are not part of the Deficiency Claim of the Prepetition Lenders in FHI Class 5 are paid in full. Upon payment in full of such non-Deficiency Claim Allowed General Unsecured Claims, the Deficiency Claim shall receive 100% of any remaining Distributions to FHI Class 5, if any.

FHI Class 5 is Impaired under the Plan, and holders of Claims in FHI Class 5 are entitled to vote to accept or reject the Plan.

The estimated recovery to Allowed FHI Class 5 Claims is unknown.

### *(a)* *Treatment of UGH Class 5.*

Unless otherwise provided for pursuant to an order of the Court or in the paragraph below, each holder of an Allowed General Unsecured Claim in UGH Class 5 shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, their Pro Rata share of all remaining property of UGH after (a) payment of the DIP Administrative Claim, Allowed Priority Claims, and Allowed Secured Claims in UGH Classes 1, 2 and 3 (solely as to the Collateral applicable to such Class), and (b) payment of the Plan Administrative Funding, until all Allowed General Unsecured Claims in UGH Class 5 are paid in full or all of the property of UGH's Estate has been distributed. Distributions to holders of Allowed UGH Class 5 Claims shall be made at such time or times that the Plan Administrator, in his discretion, determines that a Distribution to holders of Allowed UGH Class 5 Claims is appropriate, taking into consideration the number and amount of UGH Class 5 Claims that remain in dispute.

While UGH Class 5 shall include the Deficiency Claim of the Prepetition Lenders against UGH not otherwise satisfied in UGH Class 1, Distributions to the Prepetition Agent on account of such UGH Class 5 Deficiency Claim shall in no event exceed 50% of the total Distributions made to Holders of Allowed UGH Class 5 Claims until such time as all Allowed General Unsecured Claims that are not part of the Deficiency Claim of the Prepetition Lenders in UGH Class 5 are paid in full. Upon payment in full of such non-Deficiency Claim Allowed General Unsecured Claims, the Deficiency Claim shall receive 100% of any remaining Distributions to UGH Class 5, if any.

UGH Class 5 is Impaired under the Plan, and holders of Claims in UGH Class 5 are entitled to vote to accept or reject the Plan.

The estimated recovery to Allowed UGH Class 5 Claims is unknown.

### 7. *Allowed Class 6 Interests.*

Class 6 shall consist of two subclasses, FHI Class 6 and UGH Class 6:

<u>FHI Class 6 – Interests</u>: FHI Class 6 consists of Interests in FHI.

<u>UGH Class 6 – Interests</u>: UGH Class 6 consists of Interests in UGH.

The holders of Interests in both FHI Class 6 and UGH Class 6 will receive no Distribution on account of their Interests and such Interests shall be deemed cancelled as of the Effective Date.

Class 6 is Impaired under the Plan. Holders of Interests in Class 6 will not retain their Interests under the Plan, and no Distributions on account of such Interests will be made. Accordingly, holders of Interests in Class 6 are conclusively presumed to have rejected the Plan, and therefore will not be entitled to vote to accept or reject the Plan.

The estimated recovery to Allowed Class 6 Claims is 0%.

## E. Release of Liens and Perfection of Liens.

Except as otherwise provided in the Plan, any Plan Document or the Confirmation Order: (a) each holder of a judgment shall on the Effective Date (i) turn over and release to the Plan Administrator any and all Collateral that secures or purportedly secures such Claim, as they pertain to the properties currently owned or leased by the Liquidating Debtors or such Lien shall automatically, and without further action by the Liquidating Debtors or the Plan Administrator, be deemed released, and (ii) execute such documents and instruments as the Liquidating Debtors or the Plan Administrator may request to evidence such Claim holder's release of such property or Lien; and (b) on the Effective Date, all right, title, and interest in any and all property or assets of the Debtors shall vest in the Liquidating Debtors, subject only to the Liens under the Indebtedness Documents, which shall be released at the time such property or assets are liquidated or the Allowed Secured Claims of the Prepetition Lenders are satisfied. Any such holder of a judgment that fails to execute and deliver such release of Liens within thirty (30) days of the Effective Date shall be deemed to have no further Claim against the Liquidating Debtors or their assets or property in respect of such Claim and shall not participate in any Distribution hereunder. *Provided, however*, notwithstanding the immediately preceding sentence, any holder of a Disputed Claim shall not be required to execute and deliver such release until such time as the holder's Claim is Allowed or Disallowed.

## F. Post-Effective Date Governance.

On the Effective Date, automatically and without further action, (a) any and all remaining officers or directors or managing partners of the Debtors shall be deemed to have resigned or withdrawn; and (b) the Plan Administrator shall have all right and authority necessary, as an officer or a representative of the Debtors and pursuant to the authority given to him in the Plan, to wind up the Debtors.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 21**

AUS-6407724-1

### G. Continuing Existence.

Except as otherwise specifically provided in the Plan, upon the Effective Date, all property of the Debtors shall remain with the Liquidating Debtors to be administered and Distributed by the Plan Administrator pursuant to the terms of the Plan. Upon the occurrence of the Effective Date, pursuant to § 1141(b), the Liquidating Debtors shall hold the property and assets of their Estates, subject only to the Liens under the Indebtedness Documents, which shall be released at the time such property or assets are liquidated or the Allowed Secured Claims of the Prepetition Lenders are satisfied.

Upon the Effective Date, the Debtors shall be thereafter referred to as the Liquidating Debtors and the Debtors' Estates shall be referred to as the Liquidating Estates. From the Effective Date, the Liquidating Debtors shall continue in existence, to the extent necessary, for the purpose of facilitating the efforts of the Plan Administrator, including, but not limited to, the following: (a) wind up the remaining affairs of the Liquidating Debtors; (b) liquidate, by conversion to Cash or other methods, any remaining assets of the Liquidating Estates as expeditiously as reasonably possible; (c) enforce and prosecute claims, interests, rights, and privileges of the Liquidating Debtors; (d) resolve Disputed Claims; (e) administer the Plan, including distributing all Cash to holders of Allowed Claims in accordance with the Plan; and (f) file appropriate tax returns, if any.

On the Effective Date, the charters and by-laws of the Debtors shall be deemed amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall be deemed amended to, among other things: (i) authorize one (1) share of common stock, $0.01 par value per share of each Debtor, ownership of which shall be restricted to the Plan Administrator, (ii) provide, pursuant to § 1123(a)(6) of the Bankruptcy Code, a prohibition against the issuance of nonvoting equity securities, and (iii) limit the activities of the Liquidating Debtors to matters related to the implementation of the Plan. Any amendment or modification to the Amended Charter and By-laws following the Confirmation Date, to the extent such modification or amendment changes the fundamental purpose of the corporation, (x) must be pursuant to authority granted by order of the Court and (y) no shareholder vote shall be required.

Unless otherwise set forth in the Plan, upon the liquidation of all assets of the Liquidating Debtors pursuant to the Plan, the payment of all amounts due to be paid by the Debtors or Liquidating Debtors under the Plan, the disposal of all patient records as permitted by the Bankruptcy Code, and the filing by the Plan Administrator of a certification to that effect with the Court, the Liquidating Debtors shall be deemed dissolved for all purposes without the necessity for any further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith; *provided*, *however*, that the Plan Administrator shall file with the appropriate state authority a certificate of cancellation. From and after the Effective Date, the Liquidating Debtors shall not be required to file any document, or take any other action, to withdraw their business operation from any state in which the Liquidating Debtors were previously conducting their business operations.

### H. The Plan Administrator.

The Debtors shall designate the Plan Administrator in the Plan Supplement. The Plan Administrator shall be deemed appointed upon entry of the Confirmation Order without further motion, application, notice, hearing, or other order of the Court.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 22**

AUS-6407724-1

On and after the Effective Date, the Plan will be administered by the Plan Administrator on behalf of the Liquidating Debtors and all actions taken thereunder in the name of the Liquidating Debtors shall be taken through the Plan Administrator.

After the Effective Date, the Plan and all remaining property of the Liquidating Estates shall be managed under the direction of the Plan Administrator as provided by the terms of the Plan and the Plan Administration Agreement.  In the performance of his duties hereunder, the Plan Administrator shall have the rights and powers of a debtor in possession under § 1107 of the Bankruptcy Code, and such other rights, powers, and duties incident to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary, including, without limitation, the filing of any necessary tax returns.

From and after the Effective Date, the Plan Administrator may, among other things, use, pledge, acquire, and/or dispose of any Liquidating Estates' property free of the restrictions imposed under the Bankruptcy Code and without prior Court approval, provided that it is entirely in conformance with the Plan and the Plan Administration Agreement, and that the Court retains jurisdiction over the Plan Administrator and the Plan.

The Confirmation Order shall provide the Plan Administrator with express authority to convey, transfer, and assign any and all property of the Liquidating Estates consistent with the terms of the Plan and the Plan Administration Agreement and to take all actions necessary to effectuate same.

The Plan Administrator shall have sole responsibility for making Distributions under the Plan and pursuing Causes of Action (including Chapter 5 Causes of Action) on behalf of the Liquidating Debtors and their Estates.  The Plan Administrator shall also have standing to monitor and seek to enforce the performance of obligations under the Plan and the performance of other provisions of the Plan.

Notwithstanding the foregoing, the Plan Administrator may not compromise and settle Claims and Causes of Action in an amount that exceeds $100,000 without an order of the Court after opportunity for notice and hearing.

## I.    Exculpation of Plan Administrator.

From and after the Effective Date, the Plan Administrator and his representatives shall not have or incur any liability to any Entity, including any holder of a Claim or Interest, for any act taken or omission made in good faith in connection with or related to their performance of the duties conferred upon them by the Plan and any Orders of the Court, except to the extent an act constitutes willful misconduct, or fraud.  No holder of a Claim or Interest or representative thereof shall have or pursue any Cause of Action against the Plan Administrator or his representatives for taking any action in accordance with the Plan, to implement the provisions of the Plan or any order of the Court.  In all respects the Plan Administrator and his representatives shall be entitled to rely upon the advice of counsel with respect to his duties and responsibilities under the Plan; provided, however, that the foregoing exculpation shall not apply to any act of willful misconduct or fraud.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 23**

AUS-6407724-1

### J. Payment of Fees and Expenses to Plan Administrator.

The Plan Administrator may employ on behalf of himself, the Liquidating Debtors, and the Liquidating Estates, without Court order, professional persons, as such term is used in the Bankruptcy Code, to assist the Plan Administrator to carry out the duties under the Plan. The Plan Administrator and his professionals shall be compensated at their respective standard hourly rates for time spent administering the implementation of the Plan and the resolution of objections to Claims, if any are asserted, without further motion or application to the Court, subject until such time as the DIP Administrative Claim and the Secured Claims in Class 1 are paid in full, to review and approval of the DIP Agent. Compensation to the Plan Administrator and his professionals, as approved by the DIP Agent to the extent applicable, which approval shall not be unreasonably withheld, shall be made (a) first, from the Plan Administration Funding, and (b) thereafter, from the remaining assets of the Liquidating Debtors.

### K. Liquidation of Assets.

On and after the Effective Date, the Plan Administrator may, without the approval of the Court, use, sell, assign, transfer, abandon, or otherwise dispose of at a public or private sale any property of the Liquidating Estates thereof for the purpose of liquidating and converting such assets to Cash, making Distributions, and administering and fully consummating the Plan.

### L. Investments.

All Cash held by the Plan Administrator in any accounts or otherwise shall be invested in accordance with § 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Court.

### M. Accounts.

The Plan Administrator may establish one or more interest-bearing accounts as it determines may be necessary or appropriate to effectuate the provisions of the Plan. To the extent reasonably possible, the Plan Administrator shall attempt to indemnify the funds in accordance with § 345 of the Bankruptcy Code.

### N. Plan Administrator Indemnification.

The Liquidating Debtors shall, to the fullest extent permitted by Texas law, indemnify and hold harmless the Plan Administrator and its agents, representatives, attorneys, professionals, and employees (each an "Indemnified Party"), from and against any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions with respect to the implementation or administration of the Plan, if the Indemnified Party acted in good faith and in a reasonable manner.

### O. Resignation, Replacement, or Termination of Plan Administrator.

From and after the Effective Date the Plan Administrator or his successor shall continue to serve in his capacity as the sole officer, director, and responsible person of the Liquidating Debtors through the earlier of (a) the date the Liquidating Debtors are dissolved in accordance with the Plan; and (b) the date the Plan Administrator resigns or is replaced or terminated. In the

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 24**

AUS-6407724-1

event that the Plan Administrator resigns or is terminated or is unable to serve, a successor shall be appointed by the Plan Administrator.

### P. Effectiveness of Securities, Instruments, and Agreements.

On the Effective Date, the Plan Administrator, on behalf of the Liquidating Debtors, shall be authorized to take all actions necessary to execute and deliver all Plan Documents issued or entered into pursuant to the Plan, including, without limitation, any agreement entered into or instrument issued or in connection with any of the foregoing or any other Plan Document.

### Q. Approval of Agreements.

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of all transactions contemplated by the Plan. Entry of the Confirmation Order shall constitute approval of such transactions and authorization for the Plan Administrator and the Debtors, as appropriate, to execute and deliver any Plan Documents required thereby.

### R. Cancellation and Surrender of Existing Securities.

On the Effective Date, all promissory notes, stock and/or bond certificates, or other instruments evidencing a Claim or Interest shall be canceled and the holders thereof shall have no rights by reason thereof, and such instruments shall evidence no rights, except the right to receive the Distributions, if any, to be made to holders of such instruments under the Plan.

### S. Entry of Final Decree.

As soon as is practicable after the Effective Date, the Plan Administrator shall File an application with the Clerk of the Court requesting the entry of a Final Decree closing the Cases; *provided, however*, the Plan Administrator shall not File an application for Final Decree until and unless the conditions to the Plan becoming effective as set forth herein have been fully met, all pending Causes of Action have been resolved by Final Order of a court of competent jurisdiction or abandoned, all patient records have been disposed of as permitted by the Bankruptcy Code, and objections to Disputed Claims have been resolved by Final Order of the Court.

### T. Retention of Rights to Pursue Causes of Action.

Pursuant to § 1123(b)(3) of the Bankruptcy Code, as of the Effective Date, the Plan Administrator (as the representative of the Liquidating Estates) shall retain and have the exclusive right to enforce against any Entity any and all Causes of Action (including Chapter 5 Causes of Action) that otherwise belong to the Debtors and arose before the Effective Date, including all Causes of Action of a trustee and debtor in possession under the Bankruptcy Code, other than those expressly released or compromised as part of or pursuant to the Plan or by other orders of the Court entered prior to the Effective Date. The Causes of Action retained hereby include, without limitation, all claims and Causes of Action listed or referenced in the Schedules, Disclosure Statement, **Appendix "4,"** and/or in any of the Plan Documents.

The Plan Administrator (as the representative of the Liquidating Estates) shall also retain and may prosecute and enforce all defenses, counterclaims, and rights that have been asserted or could be asserted by either Debtor against or with respect to all Claims asserted against the Debtors or property of the Debtors' Estates, other than those expressly released or compromised

as part of or pursuant to the Plan or by other orders of the Court entered prior to the Effective Date.  No right, Cause of Action, or other Asset shall be deemed waived or otherwise forfeited by virtue of the Debtors' failure to identify such property in the Debtors' Schedules or the Disclosure Statement accompanying the Plan unless otherwise ordered by the Court.

The Liquidating Debtors and the Plan Administrator will continue to review payments made by and transactions involving the Debtors prior to the Petition Date to determine whether preference and other actions to avoid such payments and transactions should be brought.  Failure to specifically identify potential actions in the Plan shall not be deemed a waiver of any such action by the Debtors or any other party.

### U.    Executory Contracts and Unexpired Leases.

On the Effective Date, all executory contracts and unexpired leases to which either Debtor is a party that have not otherwise been previously assumed or rejected pursuant to a Final Order of the Court or which are otherwise listed on **Exhibit A** to the Plan shall be deemed rejected without further notice or order.

The Confirmation Order shall constitute an order of the Court approving such rejections, pursuant to § 365 of the Bankruptcy Code, effective as of the Petition Date.  Any party to an executory contract or unexpired lease identified for rejection as provided herein may, within the same deadline and in the same manner established for Filing objections to Confirmation, File any objection thereto.  Failure to File any such objection within the time period set forth above shall constitute consent and agreement to the rejection.

If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Rejection Claim by the other party or parties to such contract or lease, such Rejection Claim, to the extent that it is timely Filed, shall be classified as a General Unsecured Claim; *provided*, *however*, any Rejection Claim arising from the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtors, the Estates, or after the Effective Date, the Liquidating Debtors and the Liquidating Estates, unless a proof of Rejection Claim is Filed and served on the Debtors or the Plan Administrator, as applicable, by the Rejection Damages Bar Date (which Rejection Damages Bar Date is thirty (30) days after the Effective Date).  The Plan Administrator shall File any objection to a Rejection Claim on or before the Claims Objection Deadline.

### V.    Conditions Precedent to Occurrence of the Effective Date of the Plan.

Under the terms of the Plan, the following are conditions precedent to the occurrence of the Effective Date:

●    The Confirmation Order shall have been entered and become a Final Order in form and substance satisfactory to the Debtors.

●    The DIP Agent shall have approved of the identity of the Plan Administrator.

●    Execution of any other Plan Documents, including the Plan Administration Agreement.

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 26**

AUS-6407724-1

The Debtors may waive one or more of the conditions to the occurrence of the Effective Date.

The Debtors believe all conditions to the Effective Date of the Plan will likely be satisfied and the Effective Date of the Plan could occur no later than fifteen days (15) after entry of the Confirmation Order.

No later than one (1) Business Day after the day selected by the Debtors to be the Effective Date, the Debtors shall File a notice with the Court announcing the occurrence of the Effective Date.

### W. Effect of Confirmation of the Plan.

#### 1. Releases.

##### (a) Release of the Debtors.

**Except as otherwise specifically provided by the Plan, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, of (a) all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in, the Debtors and the assets and properties of the Debtors, whether known or unknown; and (b) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtors) against, Claims (as defined in § 101 of the Bankruptcy Code) against, liabilities (as guarantor of a Claim or otherwise) of, Liens on the direct or indirect assets and properties of, and obligations of successors and assigns of, the Debtors and their successors and assigns based on the same subject matter as any Claim or Interest or based on any act or omission, transaction, or other activity or security, instrument, or other agreement of any kind or nature occurring, arising, or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was Filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan. Notwithstanding anything herein to the contrary, nothing in the Plan shall constitute a satisfaction and release of any Cause of Action against (a) any of the Debtors' current or former officers and directors of Claims arising prior to the Petition Date, except as set forth herein, or (b) any Non-Debtor guarantor or Non-Debtor obligor on any Claim related to or against the Debtors.**

##### (b) Releases by the Debtors.

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, in their own capacity and as debtors in possession, the Liquidating Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, shall be deemed to have forever released unconditionally, waived and discharged, and hereby is deemed to release unconditionally, waive, and discharge on such date the Released Parties from any and all Causes of Action (including any derivative claims) and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in**

law, equity, or otherwise, based in whole or in part upon or related to any act or omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date in any way relating to the Debtors, the Indebtedness Documents or other indebtedness for money borrowed by the Debtors, the filing of the Cases, the Cases, the Plan (including any Plan Documents), the Disclosure Statement, the pursuit of approval of the Disclosure Statement or confirmation of the Plan, or the pursuit of consummation of the Plan. Notwithstanding the foregoing release, no Released Party shall be released from acts or omissions which are the result of willful misconduct or fraud or from any obligations under the Plan or any document, instrument, or agreement executed to implement the Plan. Except as set forth herein, nothing in the Plan shall constitute a release against any of the Debtors' current or former officers and directors of claims arising prior to the Petition Date held by the Debtors and/or their Estates.

(c)    <b>Release by Holders of Claims and Interests.</b>

As of the Effective Date, each Releasing Party is deemed to have released and discharged the Debtors, Liquidating Debtors, and each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Indebtedness Documents or other indebtedness for money borrowed by the Debtors, intercompany transactions, the filing of the Cases, the Cases, the Plan (including any Plan Documents), the Disclosure Statement, the pursuit of approval of the Disclosure Statement or confirmation of the Plan, or the pursuit of consummation of the Plan, or any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding the foregoing release, no Released Party shall be released from acts or omissions which are the result of willful misconduct or fraud or from any obligations under the Plan or any document, instrument, or agreement executed to implement the Plan.

(d)    <b>Release Integral to Plan.</b>

The foregoing release provisions are an integral part of the Plan and are essential to its implementation. If and to the extent that the Court concludes that the Plan cannot be confirmed with any portion of the foregoing releases, the Debtors reserve the right to amend the Plan so as to give effect as much as possible to the foregoing releases.

2.    <b>Injunction.</b>

Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that all Entities who have held, hold, or may hold Claims against or Interests in the Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting, or continuing in any manner, directly, or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors, the Released Parties, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, the Debtors, or any property of any such transferee

<b>DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 28</b>

AUS-6407724-1

or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Released Parties, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors, or any property of any such transferee or successor; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Released Parties, any of their property, or any direct or indirect transferee of any property of, or successor-in-interest to, any of the foregoing Entities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to the Debtors, the Released Parties, any of their property, or any direct or indirect transferee of any property of, or successor-in-interest to, any Debtors; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Furthermore, except as otherwise expressly provided in the Plan, for the consideration described in the Plan, as of the Effective Date, all Entities who have held, hold, or may hold claims released pursuant to Article 10 of the Plan, whether known or unknown, and their respective agents, attorneys, and all others acting for or on their behalf, shall be permanently enjoined on and after the Effective Date, with respect to any claim released pursuant to Article 10 of the Plan, from (a) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any claim against any Released Party or the property of any of them; (b) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any Released Party or the property of any Released Party; (c) creating, perfecting, or enforcing any encumbrance of any kind against any Released Party; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to any Released Party; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan.  In the event that any Entity takes any action that is prohibited by, or is otherwise inconsistent with the provisions of Section 10.2.2 or Article 10 of the Plan, then, upon notice to the Court, the action or proceeding in which the Claim of such Entity is asserted shall automatically be transferred to the Court for enforcement of the provisions of Section 10.2.2 and Article 10 of the Plan.

### 3. Exculpation.

Neither the Debtors nor any of the Released Parties (collectively, the "**Exculpated Persons**") shall have or incur any liability to any Entity for any act taken or omission made in good faith in connection with or related to formulating, negotiating, implementing, confirming, or consummating the Plan, including any settlement referenced therein, the Disclosure Statement, or any Plan Document.  The Exculpated Persons shall have no liability to the Debtors, any Creditor, Interest holder, any other party-in-interest in the Cases or any other Entity for actions taken or not taken under the Plan, in connection herewith or with respect thereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, in good faith, including, without limitation, failure to obtain Confirmation or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects the Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, however*, that the foregoing exculpation shall not apply to any act of willful misconduct or fraud.

### 4. Binding Effect.

Upon Confirmation of the Plan and pursuant to § 1141(a), the provisions of the Plan shall bind the Debtors and all holders of Claims against or Interests in the Debtors, including their successors and assigns, whether or not they vote to accept the Plan. The Distributions made under the Plan are in full and complete settlement of all Claims and Interests against the Debtors.

### 5. Retention and Enforcement of Causes of Action.

Pursuant to § 1123(b)(3) of the Bankruptcy Code, as of the Effective Date, the Plan Administrator (as the representative of the Liquidating Estates) shall retain and have the exclusive right to enforce against any Entity any and all Causes of Action (including Chapter 5 Causes of Action) that otherwise belong to the Debtors and arose before the Effective Date, including all Causes of Action of a trustee and debtor in possession under the Bankruptcy Code, other than those expressly released or compromised as part of or pursuant to the Plan or by other orders of the Court entered prior to the Effective Date. The Causes of Action retained hereby include, without limitation, all claims and Causes of Action listed or referenced in the Schedules, Disclosure Statement and/or in any of the Plan Documents.

The Plan Administrator (as the representative of the Liquidating Estates) shall also retain and may prosecute and enforce all defenses, counterclaims, and rights that have been asserted or could be asserted by either Debtor against or with respect to all Claims asserted against the Debtors or property of the Debtors' Estates, other than those expressly released or compromised as part of or pursuant to the Plan or by other orders of the Court entered prior to the Effective Date. No right, Cause of Action, or other Asset shall be deemed waived or otherwise forfeited by virtue of the Debtors' failure to identify such property in the Debtors' Schedules or the Disclosure Statement accompanying the Plan unless otherwise ordered by the Court.

The Liquidating Debtors and the Plan Administrator will continue to review payments made by and transactions involving the Debtors prior to the Petition Date to determine whether preference and other actions to avoid such payments and transactions should be brought. Failure to specifically identify potential actions in the Plan shall not be deemed a waiver of any such action by the Debtors or any other party.

### X. Distributions Under the Plan.

See Article 8 of the Plan for a detailed description of the procedures by which Distributions will be made to the holders of Allowed Claims against the Debtors.

### Y. Other Provisions of the Plan.

### 1. Setoffs.

Except as otherwise provided in the Plan, agreements entered into in connection with the Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Court, the Debtors or the Plan Administrator may, but will not be required to, setoff against any Claim and the Distributions made with respect to the Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights, and other Causes of Action of any nature that a Debtor may hold against the holder of such Claim; *provided, however*, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other action or omission of a

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 30**

AUS-6407724-1

Debtor, nor any provision of the Plan, shall constitute a waiver or release by such Debtor of any such claims, rights, and other Causes of Action that such Debtor may possess against such holder. To the extent a Debtor fails to setoff against a holder of a Claim or Interest and the Plan Administrator seeks to collect a claim from the holder of such Claim or Interest after a Distribution to the holder of such Claim or Interest pursuant to the Plan, the Plan Administrator shall be entitled to full recovery on its claim, if any, against the holder of such Claim or Interest.

### 2. *Retention of Jurisdiction.*

Notwithstanding entry of the Confirmation Order, the Court shall retain jurisdiction as is legally permissible, including, without limitation, to determine various matters and resolve various disputes, should they arise following the entry of the Confirmation Order. Refer to Section 11.3 of the Plan for a detailed description of the matters over which the Court shall retain jurisdiction in the Cases.

### 3. *Modification to the Plan.*

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date. After the Confirmation Date, the Debtors may, upon order of the Court, amend or modify the Plan in accordance with § 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan. Further, because the Debtors have separate voting Classes, the Debtors reserve the right to File a new Plan, convert one or both of the Cases to a case under chapter 7, and/or take such other actions as they deem appropriate.

### 4. *Withdrawal and Revocation of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if the Effective Date does not occur, the Plan shall be of no further force or effect.

## V. RISK FACTORS.

Holders of Claims should read and consider carefully the factors set forth below, as well as the other information set forth in the Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), prior to voting to accept or reject the Plan.

### A. Risks Related to Projections and Estimates.

The Disclosure Statement and the materials incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. All statements other than statements of historical facts included in the Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, including but not limited to words such as "anticipates," "expects," "estimates," "believes" and "likely," are forward-looking statements. The Debtors believe that their current views and expectations are based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results. Important factors that could cause actual results to differ

materially from those in the forward-looking statements ("Cautionary Statements") are disclosed throughout the Disclosure Statement. All subsequent written and oral forward-looking statements attributable to the Debtors, or persons acting on its behalf, are expressly qualified in their entirety by the Cautionary Statements. The Debtors do not intend to update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

### B.     Objection to Classifications.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Court or other parties-in-interest will reach the same conclusion.

### C.     Risk of Nonconfirmation of the Plan.

Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the value of Distributions to dissenting Creditors and Interest holders not be less than the value of Distributions such Creditors and Interest holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all the requirements for confirmation of the Plan under the Bankruptcy Code. There can be no assurance, however, that the Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

### D.     Nonoccurrence of Effective Date of the Plan.

Even if all Classes of Claims that are entitled to vote accept the Plan, the Effective Date for the Plan may not occur. The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied. The Debtors believe that they will satisfy all requirements for the occurrence of the Effective Date and the consummation required under the Plan. There can be no assurance, however, that the Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## VI.     CONFIRMATION OF THE PLAN.

### A.     Notice to Holders of Claims and Interests.

Approval by the Court of the Disclosure Statement means that the Court found that the Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE COURT'S CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE COURT.

### B.     Voting Procedures and Requirements.

The Debtors are providing copies of the Disclosure Statement and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.  Accordingly, Classes of Claims that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.  In addition, Classes of Claims or Interests that are not entitled to a Distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

> **If you hold an Impaired Claim against either Debtor that is entitled to a Distribution under the Plan, you are entitled to vote on the Plan.  If you hold more than one Impaired Claim, you are entitled to cast a vote on account of each such Claim.  Some creditors may, therefore, be entitled to cat more than one Ballot.**

Under the Plan, only the Prepetition Lenders (who votes with respect to Classes 1 and 5), holders of Priority Non-Tax Claims (who vote with respect to Class 4) and holders of General Unsecured Claims (who vote with respect to Class 5) (Classes 1, 4, and 5, collectively, the "Voting Classes") are entitled to vote to accept or reject the Plan.  The holders of Claims in Class 2 and 3 are Unimpaired and are therefore presumed to have accepted the Plan and the solicitation of votes therefrom is not required under § 1126(f).  The holders of Interests in Class 6 (collectively, with Classes 2 and 3, the "Non-Voting Classes") will not receive a Distribution under the Plan.  Class 6, therefore, is conclusively presumed to have rejected the Plan, and the solicitation of their votes is not required under § 1126(g).

Some holders of Claims may hold Claims in more than one Impaired Class and must vote separately for each Class.  Such holders shall be sent the appropriate Ballots for each Impaired Class by the Balloting Agent.

### C.     Solicitation Materials.

The Debtors, through their Balloting Agent, Donlin, Recano & Company, Inc. (the "Balloting Agent"), will cause holders of Claims in Classes 1, 4, and 5 to receive a Solicitation Package including: (a) ballot (and return envelope) to be used in voting to accept or to reject the Plan, (b) the Disclosure Statement and Plan, (c) the Order Conditionally Approving Disclosure Statement (with exhibits intentionally omitted), (d) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan, and (d) other materials as authorized by the Court.

If you are a holder of a Class 1, Class 4, or Class 5 Claim, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the Balloting Agent as follows:

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF AUGUST 8, 2017 – Page 33**

AUS-6407724-1

1.   In Writing:

Donlin, Recano & Company, Inc.
Re: Foundation Healthcare, Inc.
Attn: Voting Department
PO Box 192016 Blythebourne Station
Brooklyn, NY 11219;

2.   Via Email:  DRCVote@DonlinRecano.com; or

3.   Via Telephone: The Voting Agent at 212-771-1128

### D.    Voting Procedures.

For holders of Claims in Classes 1, 4, and 5, all votes to accept or reject the Plan must be cast by using the form of Ballot enclosed with the Solicitation Package.  No votes other than ones using such Ballots will be counted except to the extent the Court orders otherwise.  The following voting procedures have been established:

1.    Unless otherwise provided in the Tabulation Rules (described below), a Claim will be deemed temporarily allowed for voting purposes in an amount equal to (i) if a proof of Claim has not been timely Filed, the amount of such Claim as set forth in the Schedules, or (ii) the amount of such Claim as set forth in a timely Filed proof of Claim.

2.    If a Claim is deemed Allowed in accordance with the Plan, such Claim will be temporarily allowed for voting purposes in the deemed Allowed amount set forth in the Plan.

3.    If a Claim for which a proof of Claim has been timely Filed is marked in whole or in part as contingent, unliquidated or disputed on its face, such portion of the Claim that is marked as contingent, unliquidated or disputed will be temporarily allowed for voting purposes in the amount of $1.00.

4.    If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court.

5.    If a Creditor casts more than one Ballot voting the same Claim before the Voting Deadline, the last dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus will supersede any prior Ballots.

6.    Creditors will be required to vote all of their Claims within a particular Class under the Plan either to accept or reject the Plan and may not split their vote.  A Ballot (or a group of Ballots within a Plan Class

received from a single Creditor) that partially rejects and partially accepts the Plan will not be counted.

In addition, the following tabulation procedures (the "<u>Tabulation Rules</u>") have been established for the tabulation of Ballots:

1. If a Claim holder identifies a claim amount on its Ballot that is less than the amount otherwise calculated in accordance with these Tabulation Rules, the Claim will be temporarily allowed for voting purposes in the lesser amount identified on such Ballot.

2. The Balloting Agent will not accept Ballots by email or facsimile transmission.

3. Only Ballots that are timely received with signatures will be counted. Unsigned Ballots will not be counted.

4. Ballots that are otherwise validly executed, but do not indicate either acceptance or rejection of the Plan, will not be counted.

5. Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will not be counted.

6. Ballots that are illegible, or contain insufficient information to permit the identification of the Creditor, will not be counted.

7. Questions as to the validity, form, eligibility (including time of receipt) acceptance and revocation or withdrawal of Ballots shall be determined by the Debtors through their Balloting Agent, which determination shall be final and binding.

8. The Debtors reserve the right to grant extensions to the Voting Deadline, or otherwise waive compliance with certain ballot requirements, with respect to individual holders of the Claims eligible to vote on the Plan, if such extension would be, in the Debtors' business judgment, in the best interest of the Debtors and their Estates.

TO BE COUNTED, EXCEPT TO THE EXTENT THE DEBTORS SO DETERMINE OR AS PERMITTED BY THE COURT PURSUANT TO BANKRUPTCY RULE 3018, HOLDERS OF CLAIMS MUST SIGN AND SEND THEIR BALLOTS SO THAT THEY ARE ACTUALLY RECEIVED BY THE BALLOTING AGENT NO LATER THAN 5:00 P.M. (PREVAILING CENTRAL TIME), ON <u>SEPTEMBER 1, 2017</u> (THE "<u>VOTING DEADLINE</u>")

### E.    Ballots Will Not Be Accepted by Facsimile or Email.

As mentioned above, if your Ballot is not signed and returned as described, it will not be counted.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by contacting the Balloting Agent at the above address.  Follow the directions contained on the Ballot carefully.

## F.    Acceptance.

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions discussed below.  Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are not Impaired under the Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Claims or Interests in an Impaired Class.

The Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that Class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject the Plan, are counted.

## G.    Confirmation of the Plan.

To confirm the Plan, § 1129 requires the Court to make a series of determinations concerning the Plan, including, without limitation: (i) that the Plan classified Claims and Interests in a permissible manner; (ii) that the contents of the Plan complies with the technical requirements of the Bankruptcy Code; (iii) that the Debtors have proposed the Plan in good faith; and (iv) that the Debtors have made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan or otherwise.  The Debtors believe that all of these conditions have been or will be met with respect to the Plan.

The Bankruptcy Code requires that, unless the "cram down" provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes.  Therefore, the Court must find, to confirm the Plan, that the Plan has been duly accepted.  In addition, the Court must find that the Plan is feasible and that the Plan is in the "best interests" of all holders of Claims and Interests.  Thus, even if holders of Claims were to accept the Plan by the requisite number of votes, the Court is still required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of holders of Claims and Interests.

### 1.    *The Best Interests Test.*

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, to confirm the Plan, the Court must independently determine, pursuant to § 1129(a)(7), that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan.  This requirement is satisfied if the Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

To determine the value that holders of Impaired Claims and Interests would receive if the Debtors were liquidated under chapter 7, the Court must determine the aggregate dollar amount that would be generated if the Debtors' Cases were converted to chapter 7 and a chapter 7 trustee

liquidated the Debtors' assets (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by cash held by the Debtors and reduced by certain increased costs and claims that arise in chapter 7 that do not arise in chapter 11. For further information on the Debtors' liquidation analysis, see **Appendix "3"** hereto. Based on the Liquidation Values discussed more fully in **Appendix "3"** hereto, the Debtors believe that the Plan provides recoveries to holders of Claims and Interests not less than – and likely greater than – the recoveries to holders of Claims and Interests in a chapter 7 liquidation and, therefore, satisfies § 1129(a)(7).

### 2. *Feasibility.*

Even if the Plan is accepted by each Class of Claims and Interests voting on the Plan, and even if the Court determines that the Plan satisfies the "best interests" test, the Bankruptcy Code requires that, for the Plan to be confirmed by the Court, the Debtors must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the Debtors' ability to meet their obligations under the Plan and determined that the Debtors and the Plan Administrator will be able to make all payments contemplated by the Plan.

### H.    Non-Acceptance and Cram down.

Pursuant to § 1129(b), the Court may confirm the Plan despite the nonacceptance of the Plan by an Impaired Class. This procedure is commonly referred to as a "cram down." Section 1129(b) provides that upon request of the proponent of the Plan, the Court shall confirm the Plan despite the lack of acceptance by an Impaired Class or Classes if the Court finds that (a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class; (b) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class; (c) at least one Impaired Class accepted the Plan (without counting acceptances by insiders); and (d) the Plan satisfies the requirements set forth in § 1129(a) other than § 1129(a)(8). In general, § 1129(b) permits confirmation of a plan notwithstanding non-acceptance by an Impaired Class if that Class and all junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting Class be paid in full before a junior Class may receive anything under the Plan.

### 1. *The Plan Is Fair and Equitable.*

The Bankruptcy Code establishes different "fair and equitable" tests for holders of Secured Claims, Unsecured Claims and Interests. As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such Class.

### (a)    *Secured Claims.*

With respect to a Class of Secured Claims that does not accept the Plan, the Debtors must demonstrate to the Court that either (i) the holders of such Secured Claims will retain the liens securing such Claims and will receive on account of such Claim deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in such property; or (ii) the holders of such Claims will realize the indubitable equivalent of such Claims under the Plan.

### (b)    General Unsecured Claims.

With respect to a Class of General Unsecured Claims that does not accept the Plan, the Debtors must demonstrate to the Court that either (i) each holder of a General Unsecured Claim of the dissenting Class receives or retains under the Plan property of a value equal to the Allowed amount of its General Unsecured Claim; or (ii) the holders of Claims or Interests that are junior to the Claims of the holders of such General Unsecured Claims will not receive or retain any property under the Plan.

### (c)    Interests.

With respect to a Class of Interests that does not accept the Plan, the Debtors must demonstrate to the Court that (i) each holder of an Interest of the dissenting Class receives or retains, on account of such Interest, property of a value equal to the greatest of the Allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such Interest; or (ii) the holders of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Plan.

The Debtors believe that the Plan is fair and equitable with respect to each Class treated therein.

### 2.    No Unfair Discrimination.

A Plan "does not discriminate unfairly" with respect to a nonaccepting Class if the value of the Cash and securities to be distributed to the nonaccepting Class is equal or otherwise fair when compared to the value of Distributions to other Classes whose legal rights are the same as those of the nonaccepting Class.  Because all similarly situated holders of Claims or Interests are classified together and all Claims or Interests in a given Class are treated identically, the Debtors believe the Plan does not unfairly discriminate against any Class.

## I.    Confirmation Hearing / Objections to Plan.

Section 1128(a) requires the Court, after notice, to hold a confirmation hearing (the "Confirmation Hearing").  Section 1128(b) provides that any party in interest may object to confirmation of a plan.  Notice of the Confirmation Hearing will be provided to all holders of Claims and Interests and other parties in interest (the "Confirmation Notice").  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be made in writing, specifying in detail the name and address of the person or Entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector.  Objections must be Filed with the Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and the Local Rules of the Court.

## VII.    ALTERNATIVES TO CONFIRMATION OF THE PLAN.

If the Plan is not confirmed by the Court and consummated, the alternatives to the Plan include (a) the liquidation of the Debtors under chapter 7 of the Bankruptcy Code; or (b) an alternative Plan under chapter of the Bankruptcy Code.

### A.    Liquidation Under Chapter 7.

If the Plan cannot be confirmed, the Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In that event, a trustee would be appointed to liquidate the assets of the Debtors for Distribution to holders of Claims and Interests in accordance with the priorities established by the Bankruptcy Code.  As more fully demonstrated in the Liquidation Analysis included in **Appendix "3,"** the Debtors believe that confirmation of the Plan will provide each holder of a Claim entitled to receive a Distribution under the Plan with a recovery that is not less than it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

**ACCORDINGLY, THE DEBTORS RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

### B.    Alternative Plan.

If the Plan is not confirmed, or if the Debtors' exclusive period in which to File a plan expired, any other party in interest may be entitled to File a different plan.  However, in light of the fact that the Debtors will liquidate substantially all of their assets, the Debtors believe that no feasible plan structure could be proposed other than that contained in the Plan.  The Debtors therefore believe that the Plan provides holders of Claims and Interests with the greatest value possible under the circumstances.  Furthermore, the Debtors believe that any subsequently-proposed plan would likely provide a less favorable treatment than the Plan by further delaying the payment of Distributions.

## VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES.

The Plan provides for a liquidation of the Debtors' assets and the Distribution of the proceeds of that liquidation to the Debtors' creditors pursuant to the terms of the Plan.  All Interests in the Debtors will be withdrawn.  Holders of Claims and Interests should consult their own tax advisors regarding the tax consequences of the treatment of the Claims and Interests under the Plan.

## IX.    CONCLUSION AND RECOMMENDATION.

The Debtors believe that confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests.  The Debtors therefore urge you to vote to accept the Plan.

Dated: August 8, 2017         Respectfully submitted,

University General Hospital, LLC

*/s/ Richard Zahn* _____
Richard Zahn
Manager of Class B Manager,
Foundation Surgical Health Affiliates, LLC

Dated: August 8, 2017         Respectfully submitted,

Foundation Healthcare, Inc.

*/s/ Richard Zahn* _____
Richard Zahn
Chairman of the Board of Directors

Prepared by:

Vickie L. Driver
Texas Bar No. 24026886
Christina W. Stephenson
Texas Bar No. 24049535
**HUSCH BLACKWELL LLP**
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
Phone: (214) 999-6100
Fax: (214) 999-6170
Email: vickie.driver@huschblackwell.com
Email: crissie.stephenson@huschblackwell.com

Counsel for the Debtors